IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRISTOL-MYERS SQUIBB CO.,<br>E.R. SQUIBB & SONS, L.L.C.,<br>ONO PHARMACEUTICAL CO., LTD., and<br>TASUKU HONJO,<br><br>     Plaintiffs,<br><br> v.<br><br>MERCK & CO., INC. and<br>MERCK SHARP & DOHME CORP.,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)   C.A. No. 15-572-GMS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS MERCK & CO., INC. AND MERCK SHARP & DOHME CORP.'S
<u>REPLY BRIEF SUPPORTING THEIR MOTION TO DISMISS</u>**

*Of Counsel*:

David T. Pritikin
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7359
dpritikin@sidley.com

Jeffrey P. Kushan
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8914
jkushan@sidley.com

Todd L. Krause
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5696
tkrause@sidley.com

Dated: October 14, 2015.

Steven J. Balick (#2114)
John G. Day (#2403)
Andrew C. Mayo (#5207)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
amayo@ashby-geddes.com

*Counsel for Defendants Merck & Co., Inc. and
Merck Sharp & Dohme Corp.*

{01053415;v1 }

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

ARGUMENT..................................................................................................................................1

      I.      Plaintiffs have identified no inventive features in the '994 patent claims that transform them into a patent-eligible application of a natural phenomenon. ..........1

      II.     Plaintiffs mischaracterize Merck's argument. ...........................................................6

      III.    Preemption is not determinative of patent eligibility under *Mayo*. ........................7

      IV.    No material factual disputes prevent dismissal of the action.................................9

CONCLUSION.............................................................................................................................10

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   134 S. Ct. 2347 ............................................................................................................. 7, 8

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
   788 F.3d 1371 (Fed. Cir. 2015) ................................................................................ 1, 8, 9

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
   133 S. Ct. 2107 (2013) ........................................................................................................ 5

*In re Bilski*,
   545 F.3d 943 (Fed. Cir. 2008), *aff'd* 561 U.S. 593 (2010) .............................................. 10

*Buck v. Hampton Twp. School Dist.*,
   452 F.3d 256 (3d Cir. 2006) ............................................................................................... 4

*Classen Immunotherapies, Inc. v. Biogen IDEC*,
   659 F.3d 1057 (Fed. Cir. 2011) .......................................................................................... 7

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
   132 S. Ct. 1289 (2012) ............................................................................................. *passim*

*Vanda Pharms., Inc. v. Roxane Labs., Inc.*,
   C.A. No. 14-757-GMS (D. Del.) ................................................................................. 7, 10

**Statutes**

35 U.S.C. § 101 ............................................................................................................... *passim*

35 U.S.C. § 154 ........................................................................................................................ 7

## INTRODUCTION

The claims of U.S. Patent No. 9,073,994 ("the '994 patent") are invalid because they do not incorporate any inventive features that distinguish them from the PD-1 pathway—a natural phenomenon which regulates the human immune system.  *See Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1376 (Fed. Cir. 2015) ("[W]e examine the elements of the claim to determine whether the claim contains an inventive concept sufficient to 'transform' the claimed naturally occurring phenomenon into a patent-eligible application.").  Dismissal is thus warranted.

## ARGUMENT

I.  **Plaintiffs have identified no inventive features in the '994 patent claims that transform them into a patent-eligible application of a natural phenomenon.**

Plaintiffs dispute that the '994 patent claims are ineligible to be patented, and are thus invalid, but Plaintiffs entirely fail to identify an inventive feature within the claims that distinguishes them from the natural phenomenon they admittedly encompass—the PD-1 pathway and its role in regulating the behavior of T cells.  *See Ariosa*, 788 F.3d at 1377 ("A claim that recites an abstract idea, law of nature, or natural phenomenon must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea, law of nature, or natural phenomenon.") (internal quotation marks and alterations omitted).

Initially, Plaintiffs appear to contend their claims do not encompass or implicate a natural phenomenon.  For example, Plaintiffs argue their supposed invention is "directed to a revolutionary method of treating metastatic melanoma by manipulating a patient's immune system, which, in its natural state, does *not* function to recognize, attack and destroy cancer cells." (D.I. 15 at 2 (emphasis in original).)  But this simply admits there is a natural phenomenon implicated by the '994 patent claims.  The *way* this supposedly revolutionary

method works is not by any action linked to any unique or inventive feature of an "anti-PD-1 antibody," but is instead entirely the consequence of the PD-1 pathway, which governs the behavior of T cells that attack and destroy cancer cells in the patient. Plaintiffs cannot seriously dispute that the PD-1 pathway is a natural phenomenon; it is an intrinsic mechanism of naturally occurring T cells, and it regulates the behavior of those cells continually within the body as part of the normal functioning of the body's immune system.

Perhaps recognizing the implausibility of their theory that manipulating the naturally occurring PD-1 pathway does not involve a natural phenomenon, Plaintiffs point to the "administering" and "antibody" elements of their claims, contending these phrases save the claims from invalidity under 35 U.S.C. § 101. Neither of those claim elements, however, sufficiently differentiates the claims from a natural phenomenon.

First, Plaintiffs point to the "administering" step in the claims, contending this step saves the claims because it involves administering an agent, as opposed to being "a mere diagnostic step used for data-gathering purposes." (D.I. 15 at 11–12.) But the Supreme Court in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289, 1294 (2012), found the exact same type of step—administering to a patient an agent that causes an effect in the patient—insufficient to differentiate those claims from a natural phenomenon. The Court specifically rejected the premise (now advanced by Plaintiffs) that simply administering a non-naturally occurring chemical compound to a patient as the first step of a process was enough. As the Court explained:

> While it takes a human action (the administration of a thiopurine drug) to trigger a manifestation of this relation in a particular person, the relation itself exists in principle apart from any human action. The relation is a consequence of the ways in which thiopurine compounds are metabolized by the body—entirely

> natural processes. And so a patent that simply describes that relation sets forth a natural law.

*Mayo*, 132 S. Ct. at 1297.  Precisely as in *Mayo*, the '994 patent claims call for administration of an agent that, once administered, will cause effects that are entirely attributable to natural processes within the body, namely, the natural functioning of the body's immune system, which will kill cells it sees as "foreign," including cancer cells.

Also like the claims in *Mayo*, the agent being administered in the '994 patent claims—an "anti-PD-1 monoclonal antibody"—is admittedly old and cannot save the claims from invalidity under Section 101.  In the case of *Mayo*, the agent being administered—a thiopurine drug—was admittedly old.  Likewise here, Plaintiffs nowhere suggest that anti-PD-1 antibodies are inventive, and for good reason—anti-PD-1 antibodies had been characterized and understood long before the '994 patent was filed.

Indeed, the '994 patent claims do not recite any "inventive features" of either the method of administration, or of the therapeutic agents that are to be administered.  Instead, the claims simply say to "administer[] . . . an anti-PD-1 monoclonal antibody" after which the patient's cancer is treated.  (D.I. 1-1, at claims)  The claims likewise do not list any physical or structural traits of any particular anti-PD-1 antibody or class of anti-PD-1 antibodies that will cause those antibodies to exhibit the desired anti-cancer effect when given to patients.  (*Id.*)  Rather, the claims define the anti-PD-1 antibodies entirely by reference to the functional effect the antibodies are hoped to cause when administered to a patient—treatment of metastatic melanoma in a human patient.  This circular definition is nothing more than an instruction to exploit the natural phenomenon of the PD-1 pathway to treat metastatic melanoma by administering any "human or humanized anti-PD-1 monoclonal antibody" that causes the desired effect.

Claims such as these, which attempt to claim a desired result of a natural phenomenon but otherwise fail to incorporate any inventive feature of a method or compound that will provide that result, plainly fail the test established in *Mayo*. *See Mayo,* 132 S. Ct. at 1294 (2012) ("[T]o transform an unpatentable law of nature into a patent-eligible *application* of such a law, a patent must do more than simply state the law of nature while adding the words 'apply it.'"). Thus, like the claims held invalid in *Mayo*, the '994 claims entirely fail to recite within their bounds elements that reflect an inventive concept beyond the natural phenomenon itself—the PD-1 pathway and its role in regulating the behavior of T cells. *Id.* ("[A] process that focuses upon the use of a natural law [must] also contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself.").

Notably, in their opposition, Plaintiffs chose to discuss an anti-PD-1 antibody—nivolumab, marketed as Opdivo®—that is nowhere disclosed, discussed or claimed in the '994 patent. Nivolumab is a particular anti-PD-1 antibody with defined physical and functional characteristics that was developed independently by different scientists working for a different company. It is also claimed in a different family of patents that were filed in 2005, years after the applications that gave rise to the '994 patent were filed. (*See, e.g.*, D.I. 7-1 (U.S. Patent No. 8,779,105).).[1] Those later patents to nivolumab must necessarily define something distinct from

---

[1] Plaintiffs object that supposedly "Merck impermissibly relies on materials outside of the complaint." (D.I. 15 at 13 n.5.) As explained in Merck's opening brief, however, in evaluating a motion to dismiss, a court may properly consider any "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders [and] items appearing in the record of such case." *Buck v. Hampton Twp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). Thus, Merck's opening brief cited only permissible items. (*See* D.I. 6 at 8–9 n.3.) In any event, even if the Court accepts Plaintiffs' invitation to convert the motion to dismiss into a motion for summary judgment (D.I. 15 at 13 n.5), the Court may grant the motion,

the ideas presented in the '994 patent claims, otherwise those later patent claims to nivolumab would be invalid.

Plaintiffs' decision to focus on nivolumab is a telling admission about the shortcomings of the '994 patent and its claims. For example, the claims of the '994 patent do not list any physical characteristics of nivolumab or any other anti-PD-1 antibody that might give those antibodies the capacity to treat metastatic melanoma in a patient to which they are administered. (D.I. 1-1 at claims.) Instead, the '994 patent claims recite only the "functional" effect of the natural phenomenon—the treatment of cancer, which is the result of activated T cells doing their job of killing foreign cells.

"Groundbreaking, innovative, or even brilliant discovery does not by itself satisfy the § 101 inquiry." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2117 (2013). Here, the '994 patent is directed to early-stage investigations into the regulation of the behavior of the body's naturally occurring T cells via the PD-1 pathway existing naturally within those T cells. However promising the discovery of the PD-1 pathway's operation may have been, that knowledge alone does not entitle the discoverers to patent protection for the early-stage research reflected in the '994 patent. *Mayo*, 132 S. Ct. at 1293 ("Phenomena of nature, though just discovered . . . are not patentable, as they are the basic tools of scientific and technological work."). And disclosing early stage investigations of a natural phenomenon and instructing others to exploit this discovery to treat metastatic melanoma is not sufficient to qualify for patent protection. Instead, what is required is a description of how one can practically apply the natural phenomenon, coupled with claims that incorporate the requisite attributes of

---

because (as addressed below in Section 0) Plaintiffs have not identified any disputed issues of fact material to the Section 101 analysis.

that practical application. *See Mayo*, 132 S. Ct. at 1294. The '994 patent claims plainly fail this test.

## II. Plaintiffs mischaracterize Merck's argument.

Merck has not argued or suggested that "the discovery of a new use of an existing compound or other thing would no longer be patentable," (D.I. 15 at 9), or that "a method of treatment claim cannot be patent eligible if it relies at some level on the human body's ability to respond to disease." (*Id.* at 2.) On the contrary, Merck's opening brief refuted this very notion. (D.I. 6 at 16–17.)

The key difference (with respect to Section 101) between a patent claiming a new use of an existing compound and the '994 patent claims is that the former is appropriately limited to compounds defined in objective terms (*e.g.*, by reference to the structure or physical properties of the molecule) and the latter is not. To take Plaintiffs' examples, a patent claiming a new use for Aspirin (*i.e.*, acetylsalicylic acid) or for a statin would be limited by the compound being used to deliver the new therapeutic effect. By contrast, a patent that claimed the administration of "a molecule which causes pain relief" or of "a compound which lowers cholesterol" would plainly fail the Court's test under Section 101. That is because such claims do not incorporate inventive features, but instead seek to claim the natural phenomenon itself—pain relief or cholesterol synthesis. The '994 patent claims are no different. They recite no additional features, such as structural or physical properties of a particular anti-PD-1 antibody that transform them into an *application* of a natural phenomenon, and thus do not differentiate the claimed methods from the natural phenomenon itself.

Plaintiffs cite a number of examples of supposedly patent-eligible claims to advance their arguments. Each of those cases, however, involved claims that incorporated inventive features into the claims themselves, such as by defining the actual, particular therapeutic agents to be

used in objective terms or by defining the parameters of the treatment method in such terms.  For example, the patent at issue in *Vanda Pharmaceuticals Inc. v. Roxane Laboratories, Inc.* claims methods of treatment that specified the use of a particular drug (iloperidone) in particular dosage amounts.  (*See* D.I. 15 at 18, referencing patent eligibility of the U.S. Patent No. 8,586,610 patent in *Vanda*, C.A. No. 14-757-GMS (D. Del.)).  Similarly, patent-eligible methods directed to a "treatment" using the BRCA1 and BRCA2 genes are also distinguishable because they identify a specific protein sequence, *i.e.*, the BRCA1 or BRCA2 mutations.  (*See* D.I. 15 at 15-16, citing *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107 (2013).)  And the claims upheld as patent eligible in *Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057 (Fed. Cir. 2011) recite specific steps to determine which vaccine to administer, by comparing the effectiveness of immunogens and immunogen schedules.  *See id.* at 1060 (reciting exemplary claim of '739 patent).  Those claims stand in sharp contrast to the claims of the '994 patent, which simply claim the concept of manipulating the natural PD-1 pathway to treat metastatic melanoma and not any concrete application of that concept.

**III.    Preemption is not determinative of patent eligibility under *Mayo*.**

Plaintiffs contend "[t]he proper Section 101 inquiry focuses on whether the method claims *preempt* the natural phenomenon itself." (D.I. 15 at 9 (emphasis in original).)  But the Supreme Court expressly rejected that premise—as it explained in *Alice Corporation Party Ltd. v. CLS Bank International*, 134 S. Ct. 2347.

To be clear, the proper focus is not preemption *per se,* for some measure of preemption is intrinsic in the statutory right granted with every patent to exclude competitors, for a limited time, from practicing the claimed invention.  *See* 35 U.S.C. § 154.  Rather, the animating concern is that claims should not be coextensive with a natural law, natural phenomenon, or abstract idea; a patent-eligible claim must include one or more substantive limitations that, in the

words of the Supreme Court, add "significantly more" to the basic principle, with the result that the claim covers significantly *less. See Mayo* 132 S. Ct. at 1294.

In *Mayo*, the Court made clear that the inquiry focuses on what has been added in the claim beyond the ineligible subject matter (*i.e.*, the natural phenomenon or abstract idea)—that added subject matter must differentiate the claimed method from the patent ineligible subject matter. *See Alice*, 134 S. Ct. at 2355 ("[The] framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent eligible applications of those concepts.") (citing *Mayo*, 132 S. Ct. at 1296-97; *see also Alice*, 134 S. Ct. at 2359 ("In short, the requirement for computer participation in these claims fails to supply an 'inventive concept' that represents a nontrivial, non-conventional human contribution or materially narrows the claims relative to the abstract idea they embrace."). The Federal Circuit has likewise explained that preemption is not a separate test for patent eligibility, but instead that "questions on preemption are inherent in and resolved by the § 101 analysis." *Ariosa*, 788 F.3d at 1379 (citing *Alice*, 134 S. Ct. at 2354). *See also Ariosa*, 788 F.3d at 1379 ("While preemption may signal patent ineligible subject matter, the absence of . . . preemption does not demonstrate patent eligibility."). Where patent claims "disclose only patent ineligible subject matter under the *Mayo* framework," as is the case with the '994 patent claims, "preemption concerns are fully addressed and made moot." *Id.* Plaintiffs' preemption arguments thus cannot rescue the claims of the '994 patent from invalidity under Section 101.[2]

---

[2] In addition to being legally irrelevant, Plaintiffs' theory that their claims are only invalid if they are found to wholly preempt "the human immune system" widely misses the mark. The natural phenomenon encompassed by their claim is the PD-1 pathway and its role in regulating the behavior of activated T cells, as explained in D.I. 1 at 8–10.

## IV.     No material factual disputes prevent dismissal of the action.

Plaintiffs contend that factual disputes preclude granting Merck's motion. (D.I. 15 at 14–15.) This contention has no merit. Plaintiffs have identified no factual disputes that are germane to the Section 101 analysis implicated by this motion.

For example, Plaintiffs contend the '994 patent "*for the first time*" showed that anti-PD-1 antibodies were useful in methods to treat cancer and that the "inventors 'paid attention to PD-1, PD-L1, or PD-L2 as a *new target* in cancer or infection treatment . . . ." (D.I. 15 at 14 (emphasis in original)). Setting aside whether those contentions are true, they do nothing to alter the fact that the claims seek to manipulate a natural phenomenon—the PD-1 pathway and its regulation of the behavior of T cells—and entirely fail to incorporate elements that represent an inventive contribution beyond the natural phenomenon. Plaintiffs also take issue with how the natural phenomenon at issue in this case is described (*see* D.I. 15 at 8–9). But quibbling about the terminology used to describe the natural phenomenon is of no moment. It does not change the fact that a natural phenomenon is directly and plainly implicated by the '994 patent claims, or that the claims omit any inventive feature to distinguish them from the natural phenomenon. Similarly irrelevant is what the inventors of the '994 patent allegedly "showed" or "paid attention to" (*see* D.I. 15 at 14–15). This is because the Section 101 inquiry asks only what they *claimed* in the '994 patent. *Id.*

Thus, none of the supposed factual disputes raised by Plaintiffs have any bearing on the issue raised by this motion—that the claims omit any element that reflects an inventive application of a natural phenomenon. *See Ariosa*, 788 F.3d at 1376 ("[W]e examine the elements of *the claim* to determine whether *the claim* contains an inventive concept sufficient to 'transform' the claimed naturally occurring phenomenon into a patent-eligible application.") (emphasis added). And while Plaintiffs insist that "a proper Section 101 analysis will require

discovery and factual determinations," (D.I. 15 at 15) they do not explain how such discovery might reveal a patent-eligible invention in the '994 patent *claims*. The reality is no discovery is needed to see that the patent claims are not directed to eligible subject matter.[3,4]

## CONCLUSION

Because the '994 patent does not claim eligible subject matter, the Complaint fails to state a claim for relief and Defendants respectfully request that the action be dismissed with prejudice.

---

[3] Plaintiffs' failure to identify an inventive application of the natural phenomenon anywhere in the claims of their own patent is grounds for dismissing the action. No discovery or factual disputes are implicated. If, however, the Court finds that factual evidence or expert opinion would aid its determination under Section 101, Merck respectfully requests an early opportunity for the parties to present such evidence to the Court, in a hearing or otherwise. The unnecessary expenditure of resources by the Court and the parties may be avoided through an early Section 101 determination by the Court. *See In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd* 561 U.S. 593 (2010) ("Whether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law . . . ."); *Vanda Pharms., Inc. v. Roxane Labs., Inc.*, C.A. No. 14-757-GMS (D. Del.), transcript of 9/2/2015 hearing (attached hereto as Ex. 12), at 62:13–63:8 (acknowledging the potential "economies of scale" of deciding a Section 101 issue before trial). Indeed, in the three years since *Mayo* issued, about 70 percent of Rule 12 or Rule 56 motions have been successful in invalidating at least one claim under Section 101. *See* Ex. 13, "The Alice-Effect: An Empirical Study of Section 101 Motion Practice," March 9, 2015, *available at* http://www.fr.com/fish-litigation/the-alice-effect-an-empirical-study-of-section-101-motion-practice/.

[4] All exhibits cited in this brief are identified in and attached to the Declaration of Andrew C. Mayo filed contemporaneously herewith.

*Of Counsel*:

David T. Pritikin
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7359
dpritikin@sidley.com

Jeffrey P. Kushan
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8914
jkushan@sidley.com

Todd L. Krause
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5696
tkrause@sidley.com

Dated: October 14, 2015.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

Steven J. Balick (#2114)
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
amayo@ashby-geddes.com

*Counsel for Defendants Merck & Co., Inc. and Merck Sharp & Dohme Corp.*